1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOAQUIN MURILLO,                        No.  1:15-cv-0266 KJM DB P

12                  Plaintiff,

13       v.                                  ORDER AND FINDINGS AND
                                             RECOMMENDATIONS
14   K. HOLLAND, et al.,

15                  Defendants.

16

17          Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights

18   action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges defendants' use of the Guard One Security

19   System ("Guard One") at the California Correctional Institution ("CCI") violated his Eighth

20   Amendment rights by depriving him of sleep.  Before the court is defendants' motion for

21   summary judgment.  For the reasons set forth below, this court recommends the motion be

22   granted in part and denied in part.

23                              **BACKGROUND**

24       **I.      Allegations in the Complaint**

25          Plaintiff alleges that in 2014 he was incarcerated at CCI in the Security Housing Unit

26   ("SHU").  Starting in July 2014, defendant Holland, the warden at CCI, implemented a

27   safety/security check system called Guard One.  It requires officers to use a metal wand to strike

28   the metal cell doors to register a check every 30 minutes.  Each contact made a "loud bang noise

inside the cell." In addition, the wand itself made a "loud beep." As a result of these noises, plaintiff alleges he was deprived of sleep.[1] He contended Holland, and defendants Gutierrez, identified by plaintiff as the Chief Deputy Warden, and Ybarra, a correctional sergeant, were aware of inmates' complaints of sleep deprivation but failed to investigate them or do anything to reduce the noise. (First Am. Comp. (ECF No. 52).)

## II. Procedural Background

Plaintiff filed his original complaint here in 2015. (ECF No. 1.) On screening, the court found plaintiff stated cognizable claims for deliberate indifference in violation of the Eighth Amendment against defendants Holland, Gutierrez, and Ybarra. (ECF No. 8.) After defendants filed a motion to dismiss, plaintiff filed a first amended complaint ("FAC") on December 19, 2016. (ECF No. 52.) Defendants again moved to dismiss. (ECF No. 53.) The court granted the motion in part and denied it in part. (ECF Nos. 57, 58.) Plaintiff's claims for damages alleging Eighth Amendment violations against the three defendants were allowed to proceed.

On June 22, 2017, defendants filed an answer. (ECF No. 61.) On July 11, 2017, counsel for Jorge Andrade Rico filed a notice of related cases. (ECF No. 64.) On February 2, 2018, Judge Mueller related this case to three other cases, including Mr. Rico's case. The case was reassigned to Judge Mueller and to the undersigned magistrate judge. (ECF No. 79.)

On July 20, 2018, defendants filed the present motion for summary judgment. (ECF No. 97.) Plaintiff filed an opposition (ECF No. 104) and defendants filed a reply (ECF No. 108). Plaintiff then filed a document entitled "Motion in Support of Plaintiff's Opposition to Defendants Summary Judgment." (ECF No. 109.) This document is essentially a response to defendants' reply brief, or a "sur-reply." Sur-replies are not authorized by the local rules. E.D. Cal. R. 230(l). A district court may allow a sur-reply "where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." Hill v. England, No. CVF05869RECTAG, 2005 WL 3031136, at *1 (E.D. Cal. Nov. 8, 2005). In the

---

[1] Defendants point out that in his 602 inmate appeal, plaintiff also complained that officers shone a light into his cell at each check. However, plaintiff does not raise that issue in his First Amended Complaint and states in his opposition that he is not challenging the use of lights. (See ECF No. 104 at 12.)

present case, nothing about defendants' reply brief provides a basis for the filing of an additional brief.[2] Thus, the court will strike plaintiff's sur-reply.

## MOTION FOR SUMMARY JUDGMENT

### I.  General Legal Standards

#### A.  Summary Judgment Standards under Rule 56

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

---

[2] Even if the court considered plaintiff's sur-reply, the arguments raised in it do not alter the court's analysis of the issues raised in the motion for summary judgment.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party typically may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.

However, a complaint that is submitted in substantial compliance with the form prescribed in 28 U.S.C. § 1746 is a "verified complaint" and may serve as an opposing affidavit under Rule 56 as long as its allegations arise from personal knowledge and contain specific facts admissible into evidence. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995) (accepting the verified complaint as an opposing affidavit because the plaintiff "demonstrated his personal knowledge by citing two specific instances where correctional staff members . . . made statements from which a jury could reasonably infer a retaliatory motive"); McElyea v. Babbitt, 833 F.2d 196, 197–98 (9th Cir. 1987); see also El Bey v. Roop, 530 F.3d 407, 414 (6th Cir. 2008) (Court reversed the district court's grant of summary judgment because it "fail[ed] to account for the fact that El Bey signed his complaint under penalty of perjury pursuant to 28 U.S.C. § 1746. His verified complaint therefore carries the same weight as would an affidavit for the purposes of summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

To show the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

4

T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted)

**B.   Civil Rights Act Pursuant to 42 U.S.C. § 1983**

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the deprivation
> of any rights, privileges, or immunities secured by the Constitution .
> . . shall be liable to the party injured in an action at law, suit in equity,
> or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff.  See Monell v. Dept. of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of §1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must

be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

## II.    Statement of Facts

Defendants filed a Statement of Undisputed Facts ("DSUF") as required by Local Rule 260(a).  (ECF No. 97-1.)  Plaintiff's filing in opposition to defendants' motion for summary judgment fails to comply with Local Rule 260(b).  (ECF No. 104.)  Rule 260(b) requires that a party opposing a motion for summary judgment "shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial."  Plaintiff's opposition to the summary judgment motion is a brief and over 500 pages of exhibits.  Defendants object to many of plaintiff's exhibits.  (See ECF No. 108 at 7-10.)  Because the undersigned has not relied on any of the exhibits to which defendants object, there is no need to rule on those objections.

In light of plaintiff's pro se status, the court has reviewed plaintiff's filings in an effort to discern whether he denies any material fact asserted in defendants' DSUF or has shown facts that are not opposed by defendants.  The court considers the statements plaintiff made in his verified FAC (ECF No. 52), of which he has personal knowledge, copies of appeals filed by plaintiff and by other inmates at CCI (ECF No. 104 at 51-311), the transcript of plaintiff's deposition submitted by defendants, and plaintiff's March 13, 2018 declaration (ECF No. 104 at 43-44).

Below, the court lists the undisputed, material facts.  Disputed material facts are addressed in the discussion of the merits of defendants' motion below.

### A.   Implementation of Guard One at CCI

- On May 28, 2013, the California Department of Corrections and Rehabilitation ("CDCR") revised its policy of requiring security and welfare checks for all inmates in Administrative Segregation Units ("ASU") and Security Housing Units

("SHU"). It required the checks to occur at staggered intervals not to exceed 30 minutes on first, second, and third watch. This policy was a directive from the federal court in <u>Coleman v. Brown</u> to be used as a suicide prevention measure. (DSUF #24.) CCI immediately implemented these welfare checks. (DSUF #8.)

- In May 2014, CDCR again revised its welfare check policy for ASU and SHU inmates. It required that the 30-minute checks be conducted using an electronic recording device called Guard One. (DSUF ##9, 10.) Previously, correctional staff used a handwritten log to record the checks. (DSUF #10.)

- Use of the Guard One system was a directive from the federal court in <u>Coleman v. Brown</u> as part of the suicide prevention measures. (DSUF #13.)

- The Guard One system involves a hand-held metal "pipe," a metal disc attached to each cell door, and a software program. The officer conducting rounds is required to touch the end of the pipe to the disc on the cell door. The pipe may emit a beep when contact is made or it may be used without the beep. The pipe records the contact. The data from the pipe is then downloaded to a software program on the computer of the housing unit supervisor. (DSUF #11.)

- CCI implemented the Guard One system in 2014. (DSUF #12.)

- At some point, CCI required that during first watch (10:00 p.m. to 6:00 a.m.), the pipes used in the Guard One checks at CCI should not emit a beep.[3] (DSUF #28.)

- In addition to sounds created by Guard One, many other sounds could be heard in the ASU and SHU by, among other things, the opening and closing of security

////

---

[3] In their DSUF #28, defendants state that the Guard One policy required that the pipes be silent during first watch. However, they do not explain whether that was the system from its initial implementation or whether the practice of quieting the beeping at night was instituted at a later time. During plaintiff's deposition, the deputy attorney general stated that the change was made in 2015. (Plt.'s Depo. at 90.) Of course, this court does not rely on that statement in making its findings and recommendations. Further, plaintiff's focus is on the metal-on-metal noise made when officers struck the metal pipe to the metal disk on inmates' doors. Therefore, this court focuses on that issue as well.

doors, cuffing inmates to be escorted in and out of their cells, opening and closing

food ports in cells, and officers' keys jangling.  (DSUF ## 32, 33.)

**B.  Inmate Appeals re Guard One**

- Between July 1, 2014 and December 31, 2014, CCI's Appeals Office received 26
inmate appeals (CDCR forms 602 or 602-G) from inmates complaining about the
effect of Guard One on their sleep.[4]  (DSUF #67.)  During that time,
approximately 1,000 to 1,500 inmates were housed in the SHU and ASU at CCI at
any one time.  (DSUF #38.)

- Most of those appeals were submitted by individual inmates.  However, eight
appeals were group appeals.  They ranged from the smallest group of eight (appeal
no. CCI-0-14-1583) to the largest group which included over 50 inmates (appeal
no. CCI-0-14-2137).[5]  (See ECF No. 97-4 at 42, 132-36.)

- Considering the individual and group appeals, a cautious estimate is that 100
inmates at CCI submitted appeals regarding the sleep disruption caused by the
Guard One checks between June and September 2014.[6]  (ECF No. 104 at 51-311.)

---

[4] Plaintiff attaches copies of these appeals to his opposition to the summary judgment motion. (See ECF No. 104 at 51-311.)  Defendants do not object to the validity of the copies of appeals provided by plaintiff.  (See ECF No. 108 at 7-8.)  In addition, defendants provided copies of 18 of those 26 complaints as an attachment to the declaration of M. Voong, Chief of the Office of Appeals for the CDCR.  (ECF No. 97-4.)  According to Voong, those 18 complaints are the ones that were submitted to the third level of review.  (Id. ¶ 7.)  The court also notes that while defendants identify the appeals as occurring from July 1 to December 31, 2014, at least one appeal was submitted in June 2014.  (ECF No. 97-4 at 54.)

[5] The group appeal forms include a blank line for participating inmates' CDC number, name, cell number, and signature.  That information has been redacted in the copies provided to the court. In reviewing the group appeals, this court has assumed that each redacted entry represents one inmate.

[6] As stated in the prior footnote, this number is based on the court's count of the number of inmates who appear to have participated in each appeal.  A simple count of each individual appeal (18) and the total inmates involved in the eight group appeals (163) results in a total of 181 inmates who complained of sleep deprivation due to the use of Guard One at CCI.  However, the court recognizes that many inmates may have participated in more than one group appeal or in both a group appeal and an individual one.  Therefore, the court's cautious conclusion is that at least 100 inmates complained.  Whether it was 100 inmates or 181 inmates, defendants' reference to only a "small number" or "handful" of appeals is misleading, at best.

- Copies of third level decisions on these appeals were provided to the warden between November 2014 (appeal no. CCI-0-14-1552) and March 2015 (appeal no. CCI-0-14-2234). Most were copied to the warden in December 2014.

- One appeal, no. CCI-0-14-1391, which was submitted on June 23, 2014, was "granted" at the second level of review. In response to that appeal, CCI staff conducted an "evaluation" of the Guard One system. (See ECF No. 97-4 at 58-59.) They concluded that "the Correctional Officers conducting the safety/security checks [were] conduct[ing] the safety/security checks appropriately." (Id. at 59.) Defendant Gutierrez signed the second level review for this appeal on August 6, 2014. (Id.)

**C. Plaintiff's Appeal and the Response**

- Plaintiff was incarcerated in the SHU at CCI during the time period complained of – July 2014 through April 2015, when he was transferred out of CCI. (See FAC (ECF No. 52 at 3); Change of Address (ECF No. 11).)

- Plaintiff submitted appeal no. CCI-0-14-1586 on July 13, 2014. He complained that officers were depriving him of sleep by the loud bang, beep, and bright light caused by the security checks. (ECF No. 97-4 at 116, 118.)

- Plaintiff submitted no documentary evidence to show he had suffered any physical harm from the Guard One checks. (DSUF #57.)

- First level review of plaintiff's appeal was bypassed. (ECF No. 97-4 at 116.)

- In response to plaintiff's appeal, staff inquired of supervisors for the ASU and SHU about officers' use of Guard One. The supervisors stated "that correctional officers conducting the checks were not banging or hitting the cell doors." (DSUF ##57, 62; ECF No. 97-4 at 120.)

- Defendant Ybarra prepared the second level response to plaintiff's inmate appeal no. CCI-0-14-1586. (DSUF #61; ECF No. 97-4 at 120.) Gutierrez reviewed that response and signed it on August 21, 2014. (DSUF #56; ECF No. 97-4 at 121.)

////

- On December 1, 2014, plaintiff's appeal was denied at the third level of review. The third level decision indicates that a copy of it was provided to CCI Warden Holland.  (ECF No. 97-4 at 114-15.)
- Plaintiff did not seek medical attention for issues relating to sleep deprivation when he was at CCI.  (DSUF #69.)

### D. Defendants

- Defendant Holland was the warden at CCI from 2013 to 2016.  (DSUF #21.)
- In 2014, Holland was responsible for making sure the Guard One Policy was fully implemented and that the system was functioning properly.  (DSUF #30.)
- Holland's duties as warden included supervising some high level staff.  They did not include direct supervision of correctional officers' daily responsibilities, including the Guard One checks.  (DSUF #22.)
- Defendant Gutierrez was the Associate Warden in the ASU and SHU at CCI from 2011 through 2015 when plaintiff left CCI.  He was also Acting Chief Deputy Warden at CCI from March 2014 to August 2014.  (DSUF #42.)
- As Associate Warden, Gutierrez was responsible to confirm that staff officers were trained and knew how to use Guard One according to policy. However, he did not have discretion to change the training.  (DSUF #53.)
- In 2014 and 2015, Gutierrez reviewed inmate appeals and had supervisory responsibility over correctional captains.  He did not directly supervise correctional officers while they conducted security checks.  (DSUF #43.)
- Gutierrez first learned that inmates were complaining that Guard One was affecting their sleep when he reviewed inmate appeals.  (DSUF #55.)
- Gutierrez reviewed and signed the second level decisions on almost all of the 26 inmate appeals filed between July and December 2014 regarding sleep deprivation caused by Guard One.  (See ECF No. 104 at 38, 58, 68, 80, 92, 100, 112, 123, 132, 141, 147, 164, 175, 195, 199, 209, 232, 245, 256, 267, 278, 284, 306, 318.)

////

- Defendant Ybarra was a correctional sergeant assigned to Receiving and Release at CCI in 2014 and 2015. (DSUF #59.) He did not supervise correctional officers or staff in the ASU or SHU. Nor did he have any responsibility for the implementation of Guard One or the training of the officers conducting it. (DSUF #60.)
- One of Ybarra's duties was investigating inmate appeals. (DSUF #61.)

### III. Analysis

Plaintiff claims defendants' failure to institute changes to officers' use of the Guard One system violated his Eighth Amendment right to be free of excessive noise and to sleep. Defendants argue that they were not deliberately indifferent to a serious need and, therefore, are not liable under the Eighth Amendment. They further argue that they are entitled to qualified immunity.

### A. Eighth Amendment Conditions of Confinement

#### 1. Legal Standards

Under the Eighth Amendment, "prison officials are . . . prohibited from being deliberately indifferent to policies and practices that expose inmates to a substantial risk of serious harm." Parsons v. Ryan, 754 F.3d 657, 677 (9th Cir. 2014); see also Farmer v. Brennan, 511 U.S. 825, 847 (1994) (prison official violates Eighth Amendment if he or she knows of a substantial risk of serious harm to an inmate and fails to take reasonable measures to avoid the harm). Deliberate indifference occurs when "[an] official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 841. Thus, a prisoner may state "a cause of action under the Eighth Amendment by alleging that [prison officials] have, with deliberate indifference, exposed him to [conditions] that pose an unreasonable risk of serious damage to his future health." Helling v. McKinney, 509 U.S. 25, 35 (1993). The Supreme Court has also described this first, objective, component of a conditions of confinement claims as requiring a proof that "the prison official's acts or omissions . . . deprive[d] an inmate of the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 384. "The circumstances, nature, and duration of a deprivation" are critical in determining whether the conditions complained of are

grave enough to form the basis of a viable Eighth Amendment claim. <u>Johnson v. Lewis</u>, 217 F.3d 726, 731 (9th Cir. 2000); <u>see also</u> <u>Hearns v. Terhune</u>, 413 F.3d 1036, 1042 (9th Cir. 2005) (nine-month period subjected to serious health hazards can be Eighth Amendment violation).

"The second step, showing 'deliberate indifference,' involves a two-part inquiry." <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010). "First, the inmate must show that the prison officials were aware of a 'substantial risk of serious harm' to an inmate's health or safety." <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837). "This part of [the] inquiry may be satisfied if the inmate shows that the risk posed by the deprivation is obvious." <u>Thomas</u>, 611 F.3d at 1150 (citation omitted). "Second, the inmate must show that the prison officials had no 'reasonable' justification for the deprivation, in spite of that risk." <u>Id.</u> (citing <u>Farmer</u>, 511 U.S. at 844) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably.") The deliberate indifference standard looks at the prison official's subjective state of mind. <u>Farmer</u>, 511 U.S. at 837.

### 2. Plaintiff's Deliberate Indifference Claims

Plaintiff contends each defendant was aware of the sleep deprivation caused by correctional officers' use of the Guard One system and failed to take steps to reduce the noise caused by officers striking the metal pipe against the metal disc. Defendants argue that plaintiff's lack of sleep does not amount to a "serious harm," that they took reasonable steps to investigate plaintiff's appeal and found no excessive noise caused by the use of Guard One. Therefore, they were not, deliberately indifferent to plaintiff's sleep deprivation.

### a. Objective Prong

In the first part of the deliberate indifference analysis, this court considers whether the conditions complained of were sufficiently serious under the Eighth Amendment. The undisputed facts show that plaintiff was housed in the SHU at CCI from July 2014 through April 2015. During that time, officers conducted safety checks at random intervals at least every 30 minutes throughout the day and night. Those safety checks were conducted using the Guard One system. Officers held a metal pipe that they touched to a metal disc on each inmate's door in the SHU and ASU.

While defendants make much of the fact that use of Guard One was required by the court pursuant to <u>Coleman v. Brown</u>, plaintiff is not necessarily challenging the validity of Guard One per se. To the extent that he is, this court finds defendants protected by qualified immunity since the use of Guard One was mandated by the court in <u>Coleman v. Brown</u>. <u>See</u> <u>Rico v. Beard</u>, No. 2:17-cv-1402 KJM DB P, 2019 WL 1036075, at *2 (E.D. Cal. Mar. 5, 2019) (defendants entitled to qualified immunity for claim that implementation of Guard One system is inherently unconstitutional, even if implemented without human error, because defendants were carrying out a facially valid court order).

Rather, plaintiff's claim is a challenge to the way in which Guard One was used by officers conducting the welfare checks. Thus, the issues before the court to determine whether plaintiff suffered a serious deprivation are: (1) whether officers conducting Guard One checks used unnecessary force in striking the pipe against the metal disc, causing a loud metal ringing in each cell, (2) whether that noise caused sleep deprivation, and (3) whether that sleep deprivation was sufficiently serious under the Eighth Amendment.

### i. Were Officers Using Unnecessary Force?

Defendants present evidence to show officers did not conduct the Guard One checks inappropriately. Defendants Holland and Gutierrez state that they observed officers conducting the checks. (Holland Decl. (ECF No. 97-7, ¶¶ 11, 17); Gutierrez Decl. (ECF No. 97-6, ¶ 18).) They did not observe the officers striking the metal discs with any more force than necessary. (Holland Decl. ¶ 17; Gutierrez Decl. ¶ 15.) Further, according to both defendants, the sound created by the officers striking the metal discs was not louder than some other frequent noises in the cell block. Both defendants mentioned the noises associated with transporting inmates, which included those caused by opening and closing security doors and by opening and closing food ports to cuff inmates. (Holland Decl. ¶ 12; Gutierrez Decl. ¶ 32.)

The court has no reason to doubt these statements by Holland and Gutierrez. For several reasons, however, those statements are not dispositive. First, plaintiff complained of noise occurring 24 hours a day. There is no indication that Holland and Gutierrez observed the use of Guard One at night, when there would have been, presumably, less other noise and inmates would

13

have been trying to sleep.  In fact, when Holland described the noises resulting from the transport of inmates, she stated that "[o]n average, between sixty and one-hundred inmate escorts occur each day between 7:00 a.m. and 4:00 p.m. in CCI's Facilities A and B."  (Holland Decl. ¶ 12.) No estimate was provided of the number of inmate transports occurring at night.

The second reason Holland's and Gutierrez's statements are not dispositive is that it was certainly possible that officers were more careful in their use of Guard One when they were being observed by their superiors than when they were on their own.  The final reason is that, as plaintiff points out, there is no indication Holland and Gutierrez heard the noise made by Guard One from inside a cell.  Therefore, their opinion about the level of sound caused by the use of Guard One does not resolve the issues of whether officers were striking the discs with more force than necessary or whether the resulting noise to an inmate inside his cell was so excessive at night that it prevented sleep.  See Gardner v. Andrews, No. 5:15-cv-00231 JM-PSH, 2018 WL 2307011, at *4 (E.D. Ark. Apr. 26, 2018) (Because the noise levels were taken during the day and not at night and represented the noise level at just one time on one date, the test results did not establish that the noise levels were always within standards while the inmate was in isolation.), rep. and reco. adopted, 2018 WL 2305695 (E.D. Ark. May 21, 2018).

### ii.    Did the Use of Guard One Cause Sleep Deprivation?

With respect to whether or not the Guard One metal-on-metal noise caused sleep deprivation, in addition to the statements of Holland and Gutierrez, defendants present the results of investigations conducted at Pelican Bay State Prison ("PBSP") by the special master in the Coleman case.  (See DSUF #17.)  According to defendants, the special master's report states that very few prisoners at PBSP complained of sleep deprivation caused by Guard One.  However, this court finds that information only minimally relevant, if at all, to the questions here:  whether officers at CCI were striking the metal disc with more force than necessary and whether the resulting sound in cells at CCI caused sleep deprivation.  In fact, in another part of their brief, defendants even make the argument that the investigation of noise and its effect on sleep at PBSP

////

////

14

is not necessarily relevant to a determination of noise levels at CCI.[7] Further, the fact that at least 100 inmates at CCI complained of sleep deprivation due to the use of Guard One certainly counters any import of the special master's finding that few inmates at PBSP complained. Defendants provide no evidence to rebut plaintiff's assertion that the use of Guard One at CCI deprived him of sleep.[8]

### iii. Was the Sleep Deprivation "Serious Harm"?

Defendants argue that sleep deprivation caused by Guard One is not sufficiently serious. They point to case law in which constant noise at high decibel levels was found to violate the Eighth Amendment. See Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996), amended by, 135 F.3d 1318 (9th Cir. 1998) (subjecting inmate to constant banging, yelling, and screaming could be Eighth Amendment violation); Toussaint v. McCarthy, 597 F. Supp. 1388, 1397, 1410 (N.D. Cal. 1984) (an "unrelenting, nerve-racking din" is Eighth Amendment violation), rev'd in part on other grounds, 801 F.2d 1080, 1110 (9th Cir.1986). However, those cases are not on point. The plaintiffs in those cases were alleging continual noise "so extreme that it adversely affects their hearing and mental processes." Toussaint, 597 F. Supp. at 1410. The acoustics expert in Toussaint testified about daytime sound levels, likening them to "a noisy vacuum cleaner or a

////

---

[7] In response to plaintiff's attempt to introduce evidence of a study conducted on inmates' sleep at PBSP, defendants noted: "Plaintiff refers to Dr. Terry Kupers's declaration, which discusses the impact of the Guard One checks on inmates' sleep at Pelican Bay State Prison. (ECF No. 104 at 424.) Again, even if this document were admissible, which it is not, the document itself is not evidence that the Guard One policy as implemented at the California Correctional Institution (CCI) causes sleep deprivation." (ECF No. 108 at 11 n. 1.)

[8] Defendants point out that plaintiff did not request ear plugs in an attempt to show that plaintiff did not attempt to remedy the effects of Guard One and, therefore, must not have been affected by the noise. At his deposition, plaintiff admitted that he did not ask for ear plugs. (Plt.'s Depo. at 102-03.) However, plaintiff also stated that the noise was so loud, ear plugs would not have helped. (Id. at 103.) Further, at least one inmate did request ear plugs, and was told that they were not permitted in the SHU. (See ECF No. 104 at 100.) The court will not consider that plaintiff should have made a futile request in its analysis of the harm caused by Guard One. Moreover, the fact that plaintiff did not attempt to "ameliorate the impact of the noise by asking for earplugs or a sleeping aid . . . is not adequate by itself to show that the noise was not severe or bothersome." Gordon v. Cate, No. 11-cv-03595-JST(PR), 2014 WL 848212, at *5 (N.D. Cal. Feb. 28, 2014), aff'd, 633 F. App'x 397 (9th Cir. 2016).

freight train at a distance of about 100 feet." Inmates in those cases were not alleging solely sleep deprivation.

Courts have also held that sleep deprivation alone can be an Eighth Amendment violation. "[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." Walker v. Schult, 717 F.3d 119, 126 (2d Cir. 2013); see also Harper v. Showers, 174 F.3d 716, 720 (5th Cir. 1999) ("[S]leep undoubtedly counts as one of life's basic needs. Conditions designed to prevent sleep, then, might violate the Eighth Amendment."); Tafari v. McCarthy, 714 F. Supp. 2d 317, 367 (N.D. N.Y. 2010) ("Courts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights.").

In Antonelli v. Sheahan, 81 F.3d 1422, 1433 (7th Cir. 1996), the Court of Appeals held that noise which "occurred every night, often all night, interrupting or preventing" sleep was sufficient to state a claim under the Eighth Amendment. Courts have different standards for nighttime noise than for daytime noise. See, e.g., Lunsford v. Bennett, 17 F.3d 1574, 1577 n. 2, 1580 (7th Cir. 1994) (loud noises occurring before 8:00 p.m. for several days were annoying but did not "demonstrate a disregard for the prisoner's welfare"); Hoeft v. Kasten, 691 F. Supp. 2d 927, 931 (W.D. Wisc. 2010) (loud noises occurring only during daytime hours and only occasionally at night did not exceed "contemporary bounds of decency of a mature, civilized society"), aff'd, 393 F. App'x 394 (7th Cir. 2010). Courts look to the duration of the action causing the interrupted sleep, the effects of the interrupted sleep on the inmate, and the legitimate reasons for the interrupted sleep. See Ferguson v. Cape Girardeau County, 88 F.3d 647, 650 (8th Cir.1996) (no due process violation where pretrial detainee was confined for 14 days in lighted cell, lights were necessary for observation purposes, and inmate was observed asleep for a number of hours); Hoeft, 691 F. Supp. 2d at 931.

Defendants also point to plaintiff's lack of apparent physical harm as an indication that the sleep deprivation was not serious. However, defendants cite no case law requiring such a showing. As described by the district court in Rico, long-term and regular sleep deprivation due to excessive noise may violate the Eighth Amendment. See Rico, 2019 WL 1036075, at *4.

16

This court finds triable issues of fact regarding the extent to which officers used unnecessary force in striking the metal discs on the cell doors, whether and to what extent that noise caused plaintiff sleep deprivation, and whether the sleep deprivation caused by that noise amounted to a serious harm under the Eighth Amendment.

### b. Subjective Prong

The subjective prong of the Eighth Amendment standard requires plaintiff to show officials were aware of a "substantial risk of serious harm" and they did not have a reasonable justification for failing to act. See Thomas, 611 F.3d at 1150.

### i. Defendant Gutierrez

Defendant Gutierrez signed almost every one of the second level appeal responses to the 26 appeals regarding sleep deprivation due to Guard One filed in the second half of 2014. In fact, he signed 16 second level responses regarding Guard One just in August 2014. (See ECF No. 104 at 38, 58, 68, 92, 100, 112, 123, 132, 175, 195, 256, 267, 278, 284, 306, 318.) There can be no question that by the end of August 2014, Gutierrez was well aware that numerous inmates, including plaintiff, were complaining about the effect of Guard One on their sleep.

There is little evidence about what Gutierrez did as a result of that knowledge. Gutierrez makes vague statements about what sort of investigation was conducted. In his declaration he states only that "[i]n response to the inmate appeals, inquiries were made to the supervisors for Facilities A and B, who confirmed that the correctional officers were conducting the checks according to policy and were not banging or hitting the cell doors in an effort to interfere with inmate's sleep." (ECF No. 97-6, ¶ 19.) With respect to plaintiff's appeal, Gutierrez states that "inquiries were made to the supervisors for Facilities A and B who confirmed that the correctional officers conducting the checks were not banging or hitting the cell doors or entering the cells to shine a bright light in the inmate's faces, as alleged by inmate Murillo." (Id. ¶ 21.)

Gutierrez's statements indicate that little was done to investigate inmate's complaints. There is no showing that the supervisors contacted did anything before reporting back that officers were not striking the disks with unnecessary force. Essentially, it appears that Gutierrez just disbelieved the many inmates who complained. He felt that their complaints "were at odds

with my own experience observing the checks and with the normal ambient sound levels in the housing units caused by constant daily inmate movement in and out of the housing units." (Id. ¶ 20.)

There is no indication that Gutierrez, or any supervising officers upon whom he relied, had experienced the noise conducted by Guard One checks at night and from inside a cell. Further, it is certainly possible that officers being observed conducting the checks were much more careful in the force used to touch the pipe to the disc than officers who were alone on rounds during the night. It is also possible that something short of "banging" on the metal discs caused unnecessary noise that could have been avoided by more gentle contact between the pipe and disc.

Defendants argue that they knew the Coleman special master "audited and monitored the security and welfare checks." Defendants are apparently contending that they had a right to rely on that fact to assume the Guard One checks were in compliance with policy. The evidence does not support any such reliance. There is no evidence the special master investigated the use of Guard One at CCI. Further, as discussed above, a special master investigation at PBSP is not determinative of whether officers at CCI were conducting Guard One checks appropriately.

Gutierrez was a senior official at CCI with knowledge of the many inmate complaints about sleep deprivation due to Guard One. It appears that he did very little to investigate those complaints. Further, as the reviewer at the second level of inmate appeals and as Associate Warden, and, for some of the relevant time period, Acting Deputy Warden, it appears that Gutierrez had authority to both conduct further investigations and to suggest changes to the way in which officers were using the Guard One system. There are many materials facts in dispute about Gutierrez's liability under the Eighth Amendment.

### ii.    Defendant Holland

Defendant Holland was the warden at CCI. The third level decisions on the inmate appeals show that a copy of each was provided to the warden. (See ECF No. 97-4 at 5, 15, 26, 37, 53, 107, 114, 138, 148, 158, 171, 191.) Plaintiff's third level response was one of those provided. (ECF No. 97-4 at 114-15.) Those decisions were rendered primarily in December

2014. This provides circumstantial evidence that, by the end of 2014, Holland had notice that many inmates were complaining about sleep deprivation from the use of Guard One.

In her declaration, Holland states that "generally" she "only receive[d] notice of inmate appeals that were granted or granted in part of the third level of review or appeals that were substantiated following the investigation and review of the inmate's allegations." (ECF No. 97-7, ¶ 19.) While that may have been the "general" practice, the evidence before the court shows that all third level appeal decisions were copied to the warden. Holland provides no explanation why she would not have been made aware of those appeal decisions.

Holland also states that she does not recall an issue with appeals regarding Guard One "that were granted after review and investigation." (ECF No. 97-7, ¶ 19.) However, Holland does not state whether she was aware of appeals regarding Guard One that were not granted. Further, the court finds Holland's statements regarding her knowledge of plaintiff's complaints somewhat contradictory. In her declaration, Holland states that she "first learned" of plaintiff's appeal when she was served with this suit. However, in the next sentence, she states that she does not recall receiving a copy of the third level decision on plaintiff's appeal. (Id.) This latter statement indicates that Holland may have been provided a copy of plaintiff's appeal but simply did not recall it at the time she signed her declaration in July 2018.

The court finds a material issue of fact about what Holland knew about the sleep deprivation complaints, including plaintiff's. Certainly, had she known that Guard One was being used inappropriately, Holland could have instituted a change to the way in which the Guard One security checks were conducted. Again, this court finds unresolved issues of material fact regarding Holland's liability.

### iii.    Defendant Ybarra

According to Ybarra, on August 12, 2014, he interviewed plaintiff for the second level review. (ECF No. 97-4 at 117, 120; see also DSUF #62.) Ybarra stated that plaintiff "reiterated his complaint and had nothing further to add." (Id. at 120.) However, plaintiff states that Ybarra did not interview him for the 602 appeal process. (Compl. (ECF No. 1 at 5).) Plaintiff does not explain what he would have told Ybarra had Ybarra interviewed him.

While it appears that Ybarra was aware of at least some of the complaints by inmates, he does not appear to have been involved in investigating many of them. Further, the facts show that Ybarra had no authority to do anything besides conduct investigations. Even if his investigation of plaintiff's complaint was inadequate or his reporting improper, plaintiff fails to show that Ybarra had any ability to render decisions on inmate complaints or change the way in which officers conducted the Guard One checks. Prison staff involved in the review of appeals are only liable under the Eighth Amendment when they purposely fail to pursue an appropriate remedy. Farmer, 511 U.S. at 842; see also Jett, 439 F.3d at 1098 (prison officials, particularly those in administrative positions, may be "liable for deliberate indifference when they knowingly fail to respond to an inmate's requests for help"). The undisputed facts show that Ybarra did not have the authority to provide plaintiff a remedy. Accordingly, the court finds that Ybarra should not be charged with deliberate indifference and should be dismissed from this action.

### B. Qualified Immunity

#### 1. Legal Standards

Government officials enjoy qualified immunity from civil damages unless their conduct violates clearly established statutory or constitutional rights. Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a court is presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from, Pearson v. Callahan, 555 U.S. 223 (2009) (the two factors set out in Saucier need not be considered in sequence). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). The existence of triable issues of fact as to whether prison officials were deliberately indifferent does not necessarily preclude qualified immunity. Estate of Ford v. Ramirez–Palmer, 301 F.3d 1043, 1053 (9th Cir. 2002).

////

"For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—the critical question is whether the contours of the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" <u>Mattos v. Agarano</u>, 661 F.3d 433, 442 (9th Cir. 2011) (quoting <u>al-Kidd</u>, 563 U.S. at 741) (some internal marks omitted). "The plaintiff bears the burden to show that the contours of the right were clearly established." <u>Clairmont v. Sound Mental Health</u>, 632 F.3d 1091, 1109 (9th Cir. 2011). "[W]hether the law was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Estate of Ford</u>, 301 F.3d at 1050 (citation and internal marks omitted).

In making this determination, courts consider the state of the law at the time of the alleged violation and the information possessed by the official to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. <u>Inouye v. Kemna</u>, 504 F.3d 705, 712 (9th Cir. 2007); <u>see also</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (the "salient question" to the qualified immunity analysis is whether the state of the law at the time gave "fair warning" to the officials that their conduct was unconstitutional). "[W]here there is no case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" <u>C.B. v. City of Sonora</u>, 769 F.3d 1005, 1026 (9th Cir. 2014) (citing <u>al-Kidd</u>, 563 U.S. at 740). An official's subjective beliefs are irrelevant. <u>Inouye</u>, 504 F.3d at 712.

### 2. Analysis

As set out above, the court will recommend that summary judgment be granted in favor of defendant Ybarra. Therefore, the court considers here only whether the remaining two defendants, Holland and Gutierrez, are entitled to qualified immunity. In <u>Rico</u>, the district judge considered the second part of the qualified immunity analysis – whether a constitutional right to be free of excessive noise and excessive sleep deprivation was clearly established at the time the conduct occurred. The court held that "by 2016 it was clearly established that forcing an inmate to live in an environment with excessive noise is a violation of the Eighth Amendment." <u>Rico</u>, 2019 WL 1036075, at *4.

While the time period here, 2014-2015, is earlier than that considered in Rico, the cases upon which the Rico court relied demonstrate that these rights were also clearly established as of 2014. See Jones v. Neven, 399 F. App'x 203, 205 (9th Cir. 2010); Keenan, 83 F.3d at 1090 (decided in 1996); Touissant, 597 F. Supp. at 1396, 1410 (decided in 1984); Harris v. Sexton, No. 1:18-cv-0080 DAD SAB, 2018 WL 6338730, at *1 (E.D. Cal. Dec. 5, 2018) (finding rule that "conditions of confinement involving excessive noise that result in sleep deprivation may violate the Eighth Amendment" was clearly established with respect to conduct occurring in 2015); Matthews v. Holland, No. 1:14-cv-01959 SKO PC, 2017 WL 1093847, at *8 (E.D. Cal. Mar. 23, 2017) ("It has been clearly established in the Ninth Circuit, since the 1990s, that inmates are entitled to conditions of confinement which do not result in chronic, long term sleep deprivation." (Citing Keenan, 83 F.3d at 1090-91.).) Therefore, "a reasonable officer would have known [in 2014] it was unconstitutional to ignore an inmate's complaint detailing" allegations of severe sleep deprivation caused by excessive noise. Rico, 2019 WL 1036075, at *5.[9]

Under the first part of the qualified immunity analysis, the court considers whether the facts alleged demonstrate that the defendants' conduct violated plaintiff's Eighth Amendment rights. For the reasons set forth in the prior section, there are numerous questions of fact with respect to the liability of defendants Holland and Gutierrez that cannot be resolved on summary judgment. Therefore, it is premature to consider the question of qualified immunity as well. See Wilkins v. City of Oakland, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate.").

////

---

[9] On February 22, 2019, defendants provided the court with a copy of the Ninth Circuit's February 1, 2019 decision in Hines v. Youseff, 914 F.3d 1218 (9th Cir. 2019). (See ECF No. 111.) In that case, the Ninth Circuit held that state officials were entitled to qualified immunity for exposing inmates to Valley Fever in part because officials reported to a federal receiver charged with managing the state prison system's response to Valley Fever. The district court in the present case considered Hines to find qualified immunity appropriate for defendants who did no more than implement Guard One but that it did not apply to shield defendants whose actions went beyond the scope of the court's order in Coleman requiring the use of Guard One. See Rico, 2019 WL 1036075, at *2.

**CONCLUSION**

For the foregoing reasons, IT IS HEREBY ORDERED that plaintiff's sur-reply (ECF No. 109) is stricken.

Further, IT IS RECOMMENDED that the motion for summary judgment (ECF No. 97) be granted as to defendant Ybarra and denied as to defendants Holland and Gutierrez.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, either party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  March 8, 2019

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DLB1/prisoner-civil rights/muri0266.msj