

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOAQUIN MURILLO,

      Plaintiff,

    v.

K. HOLLAND, et al.,

      Defendant.

No.  1:15-cv-0266 KJM DB P

<u>FINDINGS AND RECOMMENDATIONS</u>

    Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff alleges he suffered sleep deprivation due to defendants' use of the Guard One welfare check system in violation of his Eighth Amendment rights.  Before the court is defendants' motion for summary judgment.  For the reasons set forth below, this court recommends defendants' motion be denied.

**BACKGROUND**

    This case is proceeding on plaintiff's first amended complaint filed December 19, 2016. (ECF No. 52.)  Plaintiff alleges that the Guard One welfare check system, implemented at the

////

////

////

////

California Correctional Institution ("CCI") in 2014, caused him severe sleep deprivation.[1]  He claims defendants, who supervised correctional officers and reviewed inmate appeals, failed to investigate and attempt to reduce or mitigate the noise caused by Guard One despite knowing they were causing injury to plaintiff.  Defendants moved to dismiss the first amended complaint on the grounds that plaintiff failed to state a claim.  (ECF No. 53.)  In June 2017, the court granted in part and denied in part defendants' motion to dismiss.  (ECF Nos. 57, 58.)  The court found plaintiff sufficiently alleged Eighth Amendment claims for damages against the three defendants - Warden Holland, Deputy Warden Gutierrez, and Correctional Sergeant Ybarra - in their individual capacities.  The court dismissed plaintiff's state law claims, claims for injunctive relief, and claims against defendants in their official capacities.

After receiving notices of related cases, the court related the present case to several other cases involving use of Guard One in California prisons.  These Guard One cases have also been related to the Coleman class action.

In July 2018, defendants filed a motion for summary judgment.  (ECF No. 97.)  Among other things, defendants argued they are entitled to qualified immunity from this suit because implementation of the Guard One system was required by the court in Coleman.  On March 8, 2019, the undersigned issued findings and recommendations in which it recommended summary judgment be granted as to defendant Ybarra and denied as to defendants Holland and Gutierrez.  (ECF No. 113.)  This court found the undisputed facts showed that plaintiff could not demonstrate that Ybarra was deliberately indifferent to the excessive noise causing sleep deprivation.  This court further found disputes of material fact about what defendants Holland and Gutierrez knew about inmates' complaints about Guard One and what they did in response.  This court found

---

[1] In 2013, the court in Coleman v. Newsom, 2:90-cv-0520 KJM DB, a class action regarding mental health care in the California prisons, ordered the prisons to institute regular welfare checks on inmates in administrative segregation units ("ASU") and security housing units ("SHU").  In 2014, CCI started using the Guard One welfare check system.  On February 3, 2015, the Coleman court ordered the California prisons to use Guard One in all SHUs and ASUs.  The Guard One system is a suicide prevention measure.  It is intended to track officers' compliance with the regular welfare checks.  It requires officers to strike a metal plate on each cell door with a metal pipe.  The metal pipe has an electronic sensor that records each such contact.

1 those disputed facts material to both plaintiff's Eighth Amendment claim against those defendants

2 and Holland and Gutierrez's qualified immunity defense.

3      On August 27, 2019, Chief District Judge Mueller stayed this action pending the Ninth

4 Circuit Court of Appeals' resolution of the motion for rehearing en banc in related case Rico v.

5 Ducart, No. 19-15541 (9th Cir.); No. 2:17-cv-1402 KJM DB P (E.D. Cal.).  The Ninth Circuit

6 denied the motion for rehearing en banc and on May 6, 2021 issued the mandate for the panel's

7 decision.  See Rico v. Ducart, 980 F.3d 1292 (9th Cir. 2020) ("Rico I"[2]).

8      Defendants Holland and Gutierrez moved to lift the stay and to dismiss this case.  (ECF

9 No. 129.)  After lifting the stay, on July 28, 2023, this court issued findings and recommendations

10 in which it recommended the motion to dismiss be denied without prejudice to its renewal as a

11 motion for summary judgment and reaffirmed its prior recommendation that summary judgment

12 be granted as to defendant Ybarra.  (ECF No. 138.)  On September 29, 2023, Chief Judge Mueller

13 adopted the findings and recommendations, dismissing the motion to dismiss and granting

14 summary judgment as to defendant Ybarra.  (ECF No. 141.)

15      Defendants Holland and Gutierrez now move for summary judgment.  (ECF No. 147.)

16 Plaintiff filed an opposition (ECF No. 149) and defendants Holland and Gutierrez filed a reply

17 (ECF No. 152).[3]

18                    **MOTION FOR SUMMARY JUDGMENT**

19      Defendants move for summary judgment on the grounds that the undisputed facts show

20 they are entitled to qualified immunity from plaintiff's suit.  In the alternative, they argue plaintiff

21 cannot demonstrate a triable issue of fact on the merits of his Eighth Amendment claim.

22

23 [2] In 2019, Rico filed a second action in this court – Rico v. Ducart, 2:19-cv-1989 KJM DB P.  In
that case, Rico II, Rico challenged the use of Guard One every 30 minutes during first watch in
24 2017 and 2018, a violation of a court order in Coleman requiring Guard One checks every hour
during first watch.  This court found defendants were entitled to qualified immunity.  Id. (Feb. 8,
25 2024 Findings and Recos.).  Chief Judge Mueller adopted the recommendation that defendants'
motion to dismiss be granted and closed the case on April 16, 2024.  Plaintiff Rico's appeal of
26 that decision is pending.

27 [3] Counsel is identified on the first page of the reply as "Attorneys for Defendants Gilbert Ybarra."
(ECF No. 152 at 1.)  However, it is evident from the body of the reply brief that this is an error
28 and the reply is being filed on behalf of the remaining defendants, Holland and Gutierrez.

1    **I. Summary Judgment Standards under Rule 56**

2         Summary judgment is appropriate when the moving party "shows that there is no genuine

3    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

4    Civ. P. 56(a). Under summary judgment practice, the moving party "initially bears the burden of

5    proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litigation, 627

6    F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The

7    moving party may accomplish this by "citing to particular parts of materials in the record,

8    including depositions, documents, electronically stored information, affidavits or declarations,

9    stipulations (including those made for purposes of the motion only), admissions, interrogatory

10   answers, or other materials" or by showing that such materials "do not establish the absence or

11   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

12   support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

13        When the non-moving party bears the burden of proof at trial, "the moving party need

14   only prove that there is an absence of evidence to support the nonmoving party's case." Oracle

15   Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.); see also Fed. R. Civ. P. 56(c)(1)(B).

16   Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

17   against a party who fails to make a showing sufficient to establish the existence of an element

18   essential to that party's case, and on which that party will bear the burden of proof at trial. See

19   Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the

20   nonmoving party's case necessarily renders all other facts immaterial." Id. In such a

21   circumstance, summary judgment should be granted, "so long as whatever is before the district

22   court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

23        If the moving party meets its initial responsibility, the burden then shifts to the opposing

24   party to establish that a genuine issue as to any material fact actually does exist. See Matsushita

25   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the

26   existence of this factual dispute, the opposing party typically may not rely upon the allegations or

27   denials of its pleadings but is required to tender evidence of specific facts in the form of

28   affidavits, and/or admissible discovery material, in support of its contention that the dispute

4

exists.  See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  However, a complaint that is submitted in substantial compliance with the form prescribed in 28 U.S.C. § 1746 is a "verified complaint" and may serve as an opposing affidavit under Rule 56 as long as its allegations arise from personal knowledge and contain specific facts admissible into evidence.  See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995) (accepting the verified complaint as an opposing affidavit because the plaintiff "demonstrated his personal knowledge by citing two specific instances where correctional staff members . . . made statements from which a jury could reasonably infer a retaliatory motive"); McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987); see also El Bey v. Roop, 530 F.3d 407, 414 (6th Cir. 2008) (Court reversed the district court's grant of summary judgment because it "fail[ed] to account for the fact that El Bey signed his complaint under penalty of perjury pursuant to 28 U.S.C. § 1746.  His verified complaint therefore carries the same weight as would an affidavit for the purposes of summary judgment.").  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To show the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party."  Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be

1   drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

2   aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

3   party "must do more than simply show that there is some metaphysical doubt as to the material

4   facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

5   nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation

6   omitted).

7   **II.     Relevant Legal Standards**

8   **A.   Eighth Amendment Deliberate Indifference**

9   Under the Eighth Amendment, "prison officials are . . . prohibited from being deliberately

10  indifferent to policies and practices that expose inmates to a substantial risk of serious harm."

11  Parsons v. Ryan, 754 F.3d 657, 677 (9th Cir. 2014); see also Farmer v. Brennan, 511 U.S. 825,

12  847 (1994) (prison official violates Eighth Amendment if he or she knows of a substantial risk of

13  serious harm to an inmate and fails to take reasonable measures to avoid the harm).  Deliberate

14  indifference occurs when "[an] official acted or failed to act despite his knowledge of a

15  substantial risk of serious harm."  Farmer, 511 U.S. at 841.  Thus, a prisoner may state "a cause of

16  action under the Eighth Amendment by alleging that [prison officials] have, with deliberate

17  indifference, exposed him to [conditions] that pose an unreasonable risk of serious damage to his

18  future health."  Helling v. McKinney, 509 U.S. 25, 35 (1993).

19  "The second step, showing 'deliberate indifference,' involves a two-part inquiry."

20  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  "First, the inmate must show that the

21  prison officials were aware of a 'substantial risk of serious harm' to an inmate's health or safety."

22  Id. (quoting Farmer, 511 U.S. at 837).  "This part of [the] inquiry may be satisfied if the inmate

23  shows that the risk posed by the deprivation is obvious."  Thomas, 611 F.3d at 1150 (citation

24  omitted).  "Second, the inmate must show that the prison officials had no 'reasonable'

25  justification for the deprivation, in spite of that risk."  Id. (citing Farmer, 511 U.S. at 844)

26  ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be

27  found free from liability if they responded reasonably.")

28  ////

6

1     **B.   Qualified Immunity**

2           Government officials enjoy qualified immunity from civil damages unless their conduct

3     violates clearly established statutory or constitutional rights.  Jeffers v. Gomez, 267 F.3d 895, 910

4     (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is

5     presented with a qualified immunity defense, the central questions for the court are: (1) whether

6     the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the

7     defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue

8     was "clearly established."  Saucier v. Katz, 533 U.S. 194, 201 (2001), receded from, Pearson v.

9     Callahan, 555 U.S. 223 (2009) (the two factors set out in Saucier need not be considered in

10    sequence).  "Qualified immunity gives government officials breathing room to make reasonable

11    but mistaken judgments about open legal questions."  Ashcroft v. al-Kidd, 563 U.S. 731, 743

12    (2011).  The existence of triable issues of fact as to whether prison officials were deliberately

13    indifferent does not necessarily preclude qualified immunity.  Estate of Ford v. Ramirez–Palmer,

14    301 F.3d 1043, 1053 (9th Cir. 2002).

15          "For the second step in the qualified immunity analysis—whether the constitutional right

16    was clearly established at the time of the conduct—the critical question is whether the contours of

17    the right were 'sufficiently clear' that every 'reasonable official would have understood that what

18    he is doing violates that right.'"  Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir. 2011) (quoting

19    al-Kidd, 563 U.S. at 741) (some internal marks omitted).  "Although 'this Court's case law does

20    not require a case directly on point  for a right to be clearly established, existing precedent must

21    have placed the statutory or constitutional question beyond debate.'  This inquiry 'must be

22    undertaken in light of the specific context of the case, not as a broad general proposition.'"

23    Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5-6 (2021) (quoting White v. Pauly, 137 S. Ct. 548, 551

24    (2017) (per curiam) and Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (internal

25    quotation marks omitted).)

26          "The plaintiff bears the burden to show that the contours of the right were clearly

27    established."  Clairmont v. Sound Mental Health, 632 F.3d 1091, 1109 (9th Cir. 2011).  In

28    making this determination, courts consider the state of the law at the time of the alleged violation

7

1   and the information possessed by the official to determine whether a reasonable official in a

2   particular factual situation should have been on notice that his or her conduct was illegal.  Inouye

3   v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see also Hope v. Pelzer, 536 U.S. 730, 741 (2002)

4   (the "salient question" for the qualified immunity analysis is whether the state of the law at the

5   time gave "fair warning" to the officials that their conduct was unconstitutional).  "[W]here there

6   is no case directly on point, 'existing precedent must have placed the statutory or constitutional

7   question beyond debate.'"  C.B. v. City of Sonora, 769 F.3d 1005, 1026 (9th Cir. 2014) (citing al-

8   Kidd, 563 U.S. at 740).  An official's subjective beliefs are irrelevant.  Inouye, 504 F.3d at 712.

9      **III.**   **Undisputed Material Facts[4]**

10       Defendants filed a Statement of Undisputed Facts ("DSUF") as required by Local Rule

11  260(a).  (ECF No. 147-3.)  Plaintiff's filing in opposition to defendant's motion for summary

12  judgment includes responses to each of defendants' facts in the DSUF.  (See ECF No. 149 at 25-

13  42.)  This court also looks to facts the parties did not dispute in the litigation of defendants' prior

14  motion for summary judgment.  (See Findings and Recos. (ECF No. 113).)

15       The following facts are not disputed:

16     **A.**  **History of Court-Ordered Suicide Prevention Checks**

17     •  In 2006, due to the rate of suicides and attempted suicides by California inmates,

18       the court in Coleman ordered CDCR to undertake suicide prevention and reduction

19       programs supervised by the court's Special Master.  (DSUF #2.)

20     •  On October 2, 2006, CDCR submitted its plan to address suicides in its

21       Administrative Segregation Units ("ASU"), including a plan to continue its hourly

22       welfare checks of inmates in ASU.  (DSUF #3.)

23     •  The Coleman Special Master and Coleman plaintiffs' counsel urged CDCR to

24       adopt the American Correctional Association's standard for welfare checks in

25       ASU, which required that inmates be personally observed every thirty minutes on

26       an irregular schedule.  (DSUF #4.)

27

28  [4] Disputed facts are considered in the "Discussion" section that follows.

- On October 31, 2006, CDCR issued a policy memorandum titled 30-Minute Welfare Checks of Inmates Placed in Administrative Segregation Units, which required custody staff to conduct welfare checks of inmates, at least every 30 minutes, at irregular intervals, for the first three weeks of the inmates' placement in ASU.  (DSUF #5.)

- The Coleman court approved CDCR's policy requiring welfare checks every 30 minutes at irregular intervals and ordered the Special Master to monitor and report on the implementation of the policy.  (DSUF #6.)

- In 2007, the Special Master reported to the Coleman court that CDCR had implemented the 30-minute welfare checks, and recommended that CDCR develop a plan to train staff on accurate logging of the checks and to track and self-monitor compliance.  (DSUF #7.)

- On May 28, 2013, CDCR revised its policy to require security and welfare checks at staggered intervals not to exceed 30 minutes for all inmates in ASU and Security Housing Units ("SHU") on first, second, and third watch.  (DSUF #8.)

**B.  Implementation of Guard One**

- In May 2014, CDCR issued a policy memorandum requiring use of Guard One to conduct the 30-minute security checks (the "Guard One Policy") in all adult institutions.  (DSUF #9; Decl. of Holland (ECF No. 97-7 at 3).)

- The Guard One Policy memorandum's subject line was:  "SECURITY/WELFARE CHECK PROCEDURE UTILIZING THE GUARD ONE SYSTEM TO SUPERSEDE ADMINISTRATIVE SEGREGATION UNIT WELFARE CHECK AND SECURITY/CUSTODY ROUNDS IN SPECIALIZED HOUSING PROCEDURES."  (Ex. C to Decl. of Holland (ECF No. 97-7 at 16).)

- The Guard One Policy described the "custody staff responsibilities for conducting Security/Welfare Checks utilizing the Guard One System" to include the following:

////

9

1. Correctional officers shall use the Guard One PIPE to record all Security/Welfare Checks conducted on **all** inmates housed in ASU, PSU, SHU, and Condemned Housing. This will be accomplished by touching the PIPE to each cell front button. This will capture the time and location that the Security/Welfare Check was conducted. **Note: Staff shall no longer capture the inmates' in-cell activity via the wallet and activity buttons under this modified procedure.**

2. Correctional officers shall conduct Security/Welfare Checks on all inmates in the aforementioned housing units at staggered intervals twice an hour, not to exceed 35 minutes between checks. Staggered means checks are to be conducted at unannounced and irregular intervals so that they are unpredictable to the inmate population. Disruptions of Security/Welfare Checks shall be documented in the ASU, PSU, SHU, and Condemned Housing Unit Isolation log book.

3. During First Watch hours, correctional officers shall conduct all Security/Welfare Checks using a pre-programmed silenced First Watch PIPE. The First Watch PIPE does not omit [sic] an audible beep during use only flashing a red Light Omitting [sic] Diode (LED). The First Watch PIPE shall be marked identifying it as equipment for First Watch use only.

(ECF No. 97-7 at 16-17 (emphasis in original).)

- Attached to the Guard One Policy memorandum is a document entitled "SECURITY/WELFARE CHECK PROCEDURE GUIDELINE" ("Guidelines"). Under the heading "**PURPOSE AND OBJECTIVE**," the Guidelines state: "The purpose of this procedure is to establish specific security and operational guidelines for Security/Welfare Checks, to ensure operational compliance with the Department Operations Manual (DOM), the California Code of Regulations, Title 15 and Coleman court mandates." (ECF No. 97-7 at 19.)

- The Guidelines list the responsibilities of the following prison staff:

A. The Warden has the overall managerial responsibility for the operation of this procedure.

B. The Chief Deputy Warden has the overall functional responsibility for the operation of this procedure.

C. The Associate Warden of Housing is responsible for the application of this procedure in the ASU, PSU, SHU and Condemned Housing Unit.

////

10

D. The Captain(s) in charge of any ASU, PSU, SHU and Condemned Housing Unit Units [sic] are responsible for ensuring procedural adherence.

E. The Litigation Coordinator is responsible for monitoring this procedure for compliance with Coleman Court Mandates.

(ECF No. 97-7 at 20.)

- The Guidelines describe the methods for use of Guard One in essentially the same language as that contained in the Guard One Policy.  (ECF No. 97-7 at 20-21.)

- The Guidelines assign to the "unit supervisor" the responsibility of ensuring that "all officers tasked with conducting Security/Welfare Checks are provided training regarding this procedure and the Guard One System equipment."  (ECF No. 97-7 at 21.)

- The Guard One Policy changed the May 28, 2013 policy by requiring custody staff to use Guard One to electronically record the check for all inmates housed in ASU and SHU instead of using a hand-written log to record the checks.  (DSUF #10.)

- The Guard One system involves a hand-held "pipe," a metal disc that is attached to each cell door, and a software program. The officer conducting housing unit rounds is required to touch the end of the pipe to the disc on the cell door.  The pipe will then emit a sound and the time of the contact will be recorded on the pipe.  The data from the pipe is then downloaded into the software program on a desktop computer in the housing unit by a supervisor, which is reviewed daily to ensure compliance.  (DSUF #11.)

- In 2014, in response to a directive from CDCR headquarters, CCI implemented the Guard One Policy.  (DSUF #12.)

- Since 2014, the Coleman Special Master has monitored CDCR's implementation and use of the Guard One Policy and has recommended that CDCR continue to use the Guard One system to conduct security and welfare checks in segregated housing units.  (DSUF #14.)

////

11

- In January 2014, the <u>Coleman</u> Special Master reported that the Guard One Policy "was a significant and commendable policy change." (DSUF #15; ECF No. 98 at 126.)

- In 2014, the Special Master's suicide prevention expert examined suicide prevention practices in all 34 CDCR institutions from November 12, 2013, to July 24, 2014. The Special Master recommended that CDCR continue to use the Guard One security and welfare checks and the <u>Coleman</u> court adopted that recommendation on February 3, 2015, directing CDCR to continue performing the Guard One checks with the same frequency. (DSUF #16.)

- Since February 2015,[5] the <u>Coleman</u> court has adopted its Special Master's findings and recommendations on the Guard One Policy and has ordered CDCR to continue to conduct security and welfare checks under the Guard One Policy. (DSUF #19.)

- In January 2018, the <u>Coleman</u> court adopted the findings and recommendations in the Special Master's September 7, 2017 report that defendants continue to implement the Guard One Policy and that the Special Master continue to monitor its use. (DSUF #20.)

**C. Inmate Appeals re Guard One**

- Between June 2014 and September 2014, twenty-six inmate appeals related specifically to noise caused by the Guard One security and welfare check system were submitted by inmates housed at CCI. Of those twenty-six appeals, six were

////

////

---

[5] In the DSUF, defendants identify the date the <u>Coleman</u> court adopted its Special Master's findings and recommendations on the Guard One Policy as "[s]ince 2014." However, the evidence cited by defendants to support this statement does not support it. Rather, defendants provide three orders. The first one shows that on February 3, 2015, Chief Judge Mueller ordered CDCR to adopt the Special Master's recommendation, which included use of Guard One (Ex. K, ECF No. 98 at 340-342). The court continued to order use of Guard One in 2016 and 2018. (Exs. N and Q, ECF No. 98 at 498 and 693-696.) The evidence does not show, as defendants state, that the court in <u>Coleman</u> ordered use of Guard One starting in 2014.

screened out at the first and second level and eighteen appeals were sent to the third level for review and processing.  (ECF No. 104 at 51-311.[6])

- The Office of Appeals processed eighteen appeals filed there between June 2014 and December 31, 2014 by CCI inmates relating to noise complaints from the institution's use of the Guard One security and welfare check system.  (DSUF #68.)

- Most of the Guard One appeals were submitted by individual inmates.  However, eight appeals were group appeals.  They ranged from the smallest group of eight (appeal no. CCI-0-14-1583) to the largest group which included over 50 inmates (appeal no. CCI-0-14-2137).[7]  (See Decl. of Voong (ECF No. 97-4 at 42, 132-36).)

- Considering the individual and group appeals, a cautious estimate is that 100 inmates at CCI submitted appeals regarding the sleep disruption caused by the Guard One checks between June and September 2014.[8]  (ECF No. 104 at 51-311.)

- Defendant Gutierrez reviewed and signed the second level decisions on almost all of the twenty-six inmate appeals submitted to the second level between July and December 2014 regarding sleep deprivation caused by Guard One.  (See ECF No.

---

[6] Plaintiff attached copies of these inmate grievances to his opposition.  (ECF No. 149 at 44-323.) In their reply, defendants note that the exhibits appear to be their responses to discovery but object to them because they are not authenticated.  Plaintiff also provided copies of inmate complaints with his opposition to the prior summary judgment motion.  (ECF No. 104 at 51-311.) Defendants did not object to the validity of these copies.  (See ECF No. 108 at 7-8.)  Therefore, this court looks to those inmate complaints provided by plaintiff previously.

[7] The group appeal forms include a blank line for participating inmates' CDC number, name, cell number, and signature.  That information has been redacted in the copies provided to the court. In reviewing the group appeals, this court has assumed that each redacted entry represents one inmate.

[8] As stated in the prior footnote, this number is based on the court's count of the number of inmates who appear to have participated in each appeal.  A simple count of each individual appeal (18) and the total inmates involved in the eight group appeals (163) results in a total of 181 inmates who submitted complaints about sleep deprivation due to the use of Guard One at CCI. However, the court recognizes that many inmates may have participated in more than one group appeal or in both a group appeal and an individual one.  Therefore, the court's cautious conclusion is that at least 100 individual inmates complained.

104 at 38, 58, 68, 80, 92, 100, 112, 123, 132, 141, 147, 164, 175, 195, 199, 209, 232, 245, 256, 267, 278, 284, 306, 318.)

- Copies of third level decisions on these appeals were provided to the "warden" between November 2014 (appeal no. CCI-0-14-1552) and March 2015 (appeal no. CCI-0-14-2234). Most were copied to the warden in December 2014. (Exs. A to R to Voong Decl. (ECF No. 97-4 at 4-198).) Defendant Holland was the warden during this time period. (DSUF #21.)

- One appeal, no. CCI-0-14-1391, which was submitted on June 23, 2014, was "granted" at the second level of review. In response to that appeal, CCI staff conducted an "evaluation" of the Guard One system. (See ECF No. 97-4 at 58-59.) They concluded that "the Correctional Officers conducting the safety/security checks [were] conduct[ing] the safety/security checks appropriately." (Id. at 59.) Defendant Gutierrez signed the second level review for this appeal on August 6, 2014. (Id.)

- In 2014 and 2015, CCI housed approximately 1,000 to 1,500 inmates in the SHU and ASU in A Facility and B Facility at any given time, all of whom were subject to the security and welfare checks under the Guard One Policy. (DSUF #38.)

**D. Plaintiff's Appeal and the Response**

- Plaintiff was incarcerated in the SHU at CCI during the time period complained of, July 2014 through April 2015, when he was transferred out of CCI. (See FAC (ECF No. 52 at 3); Change of Address (ECF No. 11).)

- Plaintiff submitted appeal no. CCI-0-14-1586 on July 13, 2014. He complained that officers were depriving him of sleep by the loud bang, beep, and bright light caused by the security checks. (ECF No. 97-4 at 116, 118.)

- First level review of plaintiff's appeal was bypassed. (ECF No. 97-4 at 116.)

- In response to plaintiff's appeal, staff inquired of supervisors for the ASU and SHU about officers' use of Guard One. The supervisors "confirmed that

////

14

correctional officers conducting the checks were not banging or hitting the cell doors."  (DSUF #57; ECF No. 97-4 at 120.[9])

- Defendant Gutierrez reviewed the second level response to plaintiff's appeal no. CCI-0-14-1586 and signed it on August 21, 2014.  (DSUF 56; ECF No. 97-4 at 121.)

- On December 1, 2014, plaintiff's appeal was denied at the third level of review. The third level decision indicates that a copy of it was provided to CCI Warden Holland.  (ECF No. 97-4 at 114-15.)

- Plaintiff never sought medical attention for injuries related to sleep deprivation and never made any requests for sleep aids to address any alleged sleep disturbances. (DSUF #69.)

**E.  Defendants**

- Defendant Holland served as the Acting Warden of CCI from 2012 to 2013, and then as Warden from 2013 to 2016.  (DSUF #21.)

- Defendant Holland's duties as Warden of CCI included development, interpretation, and administration of policies and procedures governing the operation of the institution; directing staff in reviewing the effectiveness of institutional policies and activities, resolving operational problems, and directing the preparation of reports and statistical analysis.  (DSUF #23.)

- Defendants Holland and Gutierrez understood that the purpose of the May 2013 policy memorandum, titled 30-Minute Welfare Checks of Inmates Placed in Administrative Segregation Units, was to ensure that all inmates are accounted for and within their assigned housing units, to provide for the safety of all staff and inmates, as well as the security of the institution.  They also understood that it was

---

[9] Plaintiff states that he agrees to this fact "in part."  However, he does not explain what he does and does not agree with.  The only other notation on his response to DSUF #57 is an apparent question regarding who asked supervisors to check on Guard One use.  (See ECF No. 149 at 38.) Plaintiff does not appear to dispute that someone made that inquiry or that the supervisors "confirmed" officers were not banging on the cell doors.

implemented under a directive from the federal court in <u>Coleman</u> as a suicide prevention measure.  (DSUF #24.)

- In 2014, defendant Holland was responsible for making sure the Guard One Policy was fully implemented and that the system was functioning properly.  (DSUF #30.)

- In 2014, prior to implementation of the Guard One Policy, Holland inspected the Guard One electronic equipment, and observed correctional officers conducting a demonstration of the checks.  She also observed correctional officers conducting checks after the Guard One Policy was implemented and later on random tours of CCI's SHU and ASU.  The correctional officers had to make a connection between the hand-held pipe and the button on the cell door to get an accurate reading and have the check properly recorded.  Staff would have to re-do checks that were not recorded properly.  (DSUF #31.)

- Training on the procedures required under the Guard One policy was mandatory for all staff.  (DSUF #35.)

- Defendant Gutierrez has been employed by CDCR for twenty-five years in the positions of Correctional Sergeant, Correctional Captain, Correctional Lieutenant, Acting Chief Deputy Warden, and Associate Warden.  (DSUF #41.)

- Defendant Gutierrez has been the Associate Warden for Facilities A and B, the SHU and ASU at CCI since 2011.  He also served as the Acting Chief Deputy Warden at CCI from March 10, 2014 through August 2014.  (DSUF #42.)

- Defendant Gutierrez was familiar with CDCR's May 28, 2013 policy memorandum titled Revised Administrative Segregation Unit Welfare Check Procedure and Implementation of Security Inspections in Specialized Housing.  (DSUF #46.)

- Defendant Gutierrez was familiar with the Guard One Policy issued in May 2014.  (DSUF #47.)

////

- Defendants were not the immediate supervisors for the correctional officers conducting the Guard One checks.  (DSUF #34.[10])

## IV.  Discussion

Defendants' primary argument is that the undisputed facts demonstrate they are entitled to qualified immunity from this suit.  In the alternative, defendants argue that the undisputed facts show plaintiff cannot succeed on his Eighth Amendment claims.

### A.  Qualified Immunity

#### 1.  Decision in Rico I

Defendants rely on the Ninth Circuit's decision in Rico I for their argument that they are protected by qualified immunity from this suit.  Consideration of defendants' argument requires a close look at that decision and the facts underlying it.

Pelican Bay State Prison ("Pelican Bay") started using Guard One in the SHU on August 3, 2015.  Rico v. Ducart, 980 F.3d 1292, 1296 (9th Cir. 2020) ("Rico I").  Plaintiff Rico was incarcerated in the Pelican Bay SHU at that time through August 23, 2016.  Guard One was used consistently during that year.  Id.  Shortly after Guard One was implemented, Rico and other inmates filed a group grievance regarding the noise made by the use of Guard One during first watch (10:00 p.m. to 6:00 a.m.).  The inmates asked that Pelican Bay use a different system for the welfare checks, leave pod doors unlocked and slightly open, and make as little noise as possible when conducting the checks.  In response, the warden directed staff to make as little noise as possible.  Id.

Over the next several months, Rico filed five grievances in which he complained about the noise made by the batons hitting the cell doors and the noise made by opening and closing the pod doors.  In response, prison staff recognized that some noise was generated by use of the Guard One system and told plaintiff staff had been instructed to touch the cell doors as lightly as possible.  Plaintiff was told that there was nothing that could be done to make the pod doors

---

[10] Plaintiff disagrees with this statement but simply states that Holland was generally responsible for officers' conduct.  Plaintiff does not dispute that neither defendant directly supervised the correctional officers.

1  quieter.  Id.  In his federal court complaint, plaintiff alleged, among other things, that correctional

2  officers ("floor officers") were making "extra noise by conducting the Guard One checks

3  haphazardly" and that supervisory prison officials who reviewed Rico's grievances were aware of

4  the problem and failed to take action to address Rico's sleep deprivation.  Id. at 1297.

5       Relevant to the present case, the district court denied summary judgment on the grounds

6  of qualified immunity for the supervisory officials and the floor officers.  The court held that Rico

7  had clearly established rights to be free from excessive sleep deprivation and to be free from

8  excessive noise.  Rico v. Beard, No. 17-cv-1402 KJM DB P, 2019 WL 1036075, at *5 (E.D. Cal.

9  Mar. 5, 2019).  The court held that a reasonable prison official reviewing Rico's appeals would

10  have known "it was unconstitutional to ignore an inmate's complaint detailing such allegations."

11  Id.  Regarding the floor officers, the district court reasoned that "a reasonable officer would have

12  known it was unlawful to create a racket" in executing the Guard One system.  Id.

13       The supervisory officials and floor officers appealed.  In addressing whether federal law

14  created a "clearly established" right, the Ninth Circuit noted that "[e]xisting precedent does

15  recognize *general* rights against excess noise and prison conditions that deprive inmates of

16  'identifiable human need[s],' such as sleep."  Rico I, 980 F.3d at 1298 (emphasis in original)

17  (quoting Wilson v. Seiter, 501 U.S. 294, 304 (1991) (additional citations omitted)).  The court

18  then focused on the second prong of the qualified immunity analysis: "whether existing precedent

19  placed the question 'beyond debate' that every reasonable official would have understood that his

20  specific actions violated a clearly established right."  Id. at 1299.  The court determined that this

21  question requires looking at the particular facts of the case.

22       The SHU at PBSP has an unusual, circular design unlike most prison SHUs that are

23  arranged along a straight hall.  The Ninth Circuit described it as follows:

24       Pelican Bay's SHU contains six pods arranged around a circular core.
The door to each pod is made of metal. Inside each pod, two floors
25       of four cells line one side of the pod. Metal stairs connect the two
floors of cells on the other side. The door to each cell is also made of
26       metal.

27       Each time a pod door opens and closes, the door makes a loud noise
for approximately twelve seconds. When the door fully closes, it
28       makes a loud sound that resonates through the walls. Inmates can

1
2
3

> hear the doors of all six pods opening and closing. As the officers conduct their rounds, inmates can also hear the noise of the officers' boots on the metal stairs and the metal-on-metal noise of the wands hitting the discs on every cell in their own pod and the two neighboring pods.

4   Rico I, 980 F.3d at 1296.

5          While recognizing that Rico alleged the floor officers were conducting the checks

6   unnecessarily loudly, the court found Rico was alleging that much of the noise was caused by the

7   prison's design, which made the use of Guard One "inherently" noisy.  Id. at 1301-02.  The court

8   also relied on the fact that use of Guard One was required by the court in Coleman:  "Existing

9   caselaw did not provide insight into the lawfulness of creating noise while conducting court-

10  ordered suicide-prevention welfare checks in a maximum security facility built of concrete, metal,

11  and steel."  Rico I, 980 F.3d at 1299.  Further, "no reasonable official would believe that creating

12  additional noise while carrying out mandatory suicide checks for prisoner safety clearly violated

13  Rico's constitutional rights."  Id. at 1303.  The Ninth Circuit stressed that its decision was based

14  on the "specific facts presented here."  Id. at 1299.

15          **2.  Applicability of Rico I**

16          Based on the Ninth Circuit's holding in Rico I, it is clearly established that severe

17  deprivation of a prisoner's sleep and excessive noise can amount to Eighth Amendment

18  violations.  Rico I, 980 F.3d at 1298.  The next question, then, is a fact-specific one:  whether "the

19  contours of the right were sufficiently clear that every reasonable official would have understood

20  that what he is doing violates that right."  Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir. 2011)

21  (internal quotation marks and citation omitted).  Resolving this issue necessarily involves two

22  considerations:  identifying the relevant facts of which defendants were aware and then

23  considering whether a reasonable official with knowledge of those facts would have understood

24  that what they were doing violated the prisoner's rights.  See Inouye v. Kemna, 504 F.3d 705, 712

25  (9th Cir. 2007).  The evidence produced in the present case shows one important similarity with

26  the evidence in Rico – defendants in both cases understood that the prison implemented Guard

27  One at the behest of the court in Coleman.  The evidence also shows important differences,

28  ////

19

1 primarily the structure of the SHUs at each prison and the number of inmate complaints. This

2 court considers each of those issues below.

3     **a. Defendants' Understanding of Court's Role in Use of Guard One**

4     The Ninth Circuit in <u>Rico I</u> relied heavily on the fact that defendants were using the Guard

5 One checks at Pelican Bay as the result of an order issued in <u>Coleman</u>. <u>Rico I</u>, 980 F.3d at 1299.

6 In the present case, CCI implemented Guard One based on the Guard One Policy issued by

7 CDCR in May 2014. (DSUF #12.) While the <u>Coleman</u> court did not specifically order use of

8 Guard One until February 2015 (DSUF #16), both defendants state that they understood use of

9 Guard One under the Guard One Policy was a directive from the court in <u>Coleman</u>. (<u>See</u> ECF

10 Nos. 97-6 at 2-3; 97-7 at 3.) Plaintiff challenges those statements. (<u>See</u> Plt's Resp to DSUF

11 (ECF No. 149 at 30).) However, plaintiff presents no evidence to back up his challenge. The

12 evidence presented shows that defendants reasonably could have understood that the court

13 directed use of Guard One in 2014. The Guard One Policy stated its purpose and objective was,

14 among other things, to "ensure operational compliance with . . . Coleman court mandates." (ECF

15 No. 97-7 at 19.) The Policy described the responsibilities of the Litigation Coordinator as

16 "monitoring this procedure for compliance with Coleman Court Mandates." (<u>Id.</u> at 20.) This

17 court finds no legitimate dispute of fact regarding defendants' understanding that CCI

18 implemented Guard One at the behest of the <u>Coleman</u> court.

19     **b.   Structure of the SHUs**

20     The second primary basis for the Ninth Circuit's holding is the fact that Pelican Bay's

21 unique construction made the use of Guard One inherently noisy. In fact, Rico's allegations

22 recognized that much of the noise affecting his sleep was the result of the prison's construction.

23 Rico complained about the opening and closing of pod doors, in addition to the noise cause by the

24 contact of the Guard One pipe with the metal disks on the cell doors . <u>Rico I</u>, 980 F.3d at 1296.

25     Plaintiff in the present case does not allege in the first amended complaint, nor did he state

26 in his grievance, that CCI's design contributed to his sleep deprivation. Rather, in his grievance,

27 plaintiff complained of the banging and beeping caused by the Guard One pipes and the light

28 being shone into the cell as part of the checks. (ECF No. 97-4 at 116-18.) In the first amended

complaint, plaintiff contends that the noise depriving him of sleep was caused by the "banging of the cell doors with the[ir] metal wands," and "when a person complained verbally some officers would go out of the[ir] way to bang extra hard." (ECF No. 52 at 6.) Plaintiff alleges the officers told the complaining prisoners to file a grievance if they didn't like it. According to plaintiff, the officers did not want to use the Guard One system and were using it as "a torture weapon to get the inmates to complain so as to get the checks to stop." (Id.) Plaintiff added that the sleep deprivation was aggravated by hearing the banging on the 20 or so doors in his pod. (Id.) While that noise could be attributed to the CCI SHU's design, it can also be attributed to the officers' unnecessarily loud banging on each cell door in the pod. Plaintiff does not allege that other noise that might be inherent in the design - the sound of officers footsteps on metal stairs or the sound of pod doors opening and closing - contributed to the noise waking him.[11] Defendants point to no evidence that the other CCI inmates who complained about Guard One mentioned doors or footsteps either. In Rico I, the Ninth Circuit found that the welfare checks would have created significant noise even if Guard One was "perfect[ly]" implemented. 980 F.3d at 1302. The facts before the court in the present case do not lead to that conclusion.

With respect to CCI's design, there is no evidence in the present case that CCI's SHU is designed in a way that would result in excessive noise if officers were not using Guard One by banging on the cell doors. In fact, there is little, if any, evidence regarding CCI's design. This court finds the absence of such evidence surprising. In her order denying defendants' motion to dismiss, Chief Judge Mueller agreed with this court's conclusion that to determine the noise attributable to Guard One, the court "must conduct a fact specific inquiry related to CCI's

---

[11] Defendants point out that in his 2018 deposition plaintiff stated that the sound of pod doors opening and closing contributed to his sleep deprivation. (ECF No. 149 at 363.) However, that is not what defendants were told in plaintiff's grievance. (See ECF No. 97-4 at 116-18.) Rather, plaintiff complained about the banging, the beep, and the light being shined into the cell. Further, defendants do not show that other inmates' grievances raised the issue. This court's review of some of the group appeals shows no mention of pod doors, jangling keys, or footsteps. (See ECF No. 104 at 285-87 (complaint of banging and beeping); 97-4 at 130 (complaint of banging).). With respect to the qualified immunity analysis, the information before defendants was that it was the metal on metal contact, and in some instances the beep, that were the primary problems keeping inmates from sleeping.

1   physical structure and unique noise levels before it makes any decision on qualified immunity."

2   (ECF No. 141 at 2.)

3          Defendants' only evidentiary showings do not mention CCI's design specifically.  Rather,

4   they present only their essentially identical statements regarding noise in the ASU and SHU

5   generally.  Both defendants state that the following noises are made during security checks and

6   during regular inmate counts:  a "metal clanking" or "clanging" sound is created when the

7   security doors into each housing unit are opened and closed," "jangling keys, locks opening,

8   footsteps."  In addition, defendants state that during the day, noise is generated to cuff and move

9   inmates, which occurs frequently.  That noise includes both the noise made by any entry and exit

10  into the cell pod - the metal doors, keys, locks, and footsteps - and the noise made by opening and

11  closing food ports to cuff the inmates and opening and closing the cell doors.  Both defendants

12  state that this inmate movement is louder than the sounds generated by use of Guard One.  (ECF

13  Nos. 97-6 at 3-4; 97-7 at 4-5.)

14         For at least two reasons, this court finds defendants' statements largely unhelpful.  First,

15  defendants only describe inmate movement occurring during the day.  Notably, defendants do not

16  state that the sounds attributable solely to officers entering and exiting the pod at night are louder

17  than the sounds generated by use of Guard One at that time.  Second, defendants do not state that

18  the CCI SHU's design made those noises particularly loud or caused the noise generated by even

19  the appropriate use of Guard One to be particularly loud.  (ECF No. 97-6 at 3-4; ECF No. 97-7 at

20  5-6.)

21         With respect to the effect of noise generated by officers walking in and out of the SHU

22  pod to conduct Guard One checks, this court finds it relevant that there has been no showing that

23  prisoners made complaints about noise prior to the use of Guard One.  The court in Coleman

24  ordered regular round-the-clock security checks starting in 2013.  If the CCI SHU was

25  constructed in such a way that prisoners experienced noise affecting their sleep prior to the use of

26  Guard One, at least come complaints would be expected.  A showing that there were few

27  complaints prior to the implementation of Guard One could support a showing that Guard One

28

1  was, in fact, causing inmates' sleep disruption.  At the very least, this is an issue of fact that

2  would be relevant to determining the noise level generated by use of Guard One.

3  **c.   Other Inmate Complaints**

4  A second difference between the facts present here and those set out in <u>Rico I</u>, is the

5  number of inmate complaints about the use of Guard One.  A group of eight inmates, including

6  plaintiff Rico, filed the initial grievance about the use of Guard One in the Pelican Bay SHU.[12]  In

7  <u>Rico I</u>, the Ninth Circuit discussed only Rico's grievances after that.  There is no indication in the

8  decision that other inmates submitted grievances.  In the present case, there is evidence that at

9  least 100 inmates submitted grievances around the same time plaintiff submitted his grievance.

10  **3.   Are Defendants Entitled to Qualified Immunity?**

11  **a.   What Defendants Knew**

12  **i.   Defendant Gutierrez**

13  Gutierrez was the Acting Chief Deputy Warden for the first two months plaintiff was

14  incarcerated in the SHU – July and August 2014.  After that, Gutierrez was the Associate

15  Warden.  As discussed above, this court finds no triable issue of fact regarding whether Gutierrez

16  understood that CCI was required by the court to use the Guard One checks in the ASU and SHU

17  and that CCI must follow the Guard One procedures – having officers conduct the regular,

18  around-the-clock, checks by touching the metal pipe to the metal disks on cell doors.

19  The evidence shows that Gutierrez was aware that many inmates were complaining that

20  the Guard One checks were causing sleep deprivation.  Gutierrez signed the second level

21  responses for almost all of the 26 inmate grievances provided to the court.  (<u>See</u> ECF No. 104 at

22  38, 58, 68, 80, 92, 100, 112, 123, 132, 141, 147, 164, 175, 195, 199, 209, 232, 245, 256, 267, 278,

23  284, 306, 318.)  There is no question, then, that Gutierrez was aware that over 100 inmates

24  submitted grievances about noise and sleep disruption due to the use of Guard One.

25  ////

26  _____

27  [12] The Ninth Circuit mentions that the first grievance filed regarding Pelican Bay was a group grievance.  Plaintiff Rico attached a copy of that grievance to his complaint.  <u>Rico v. Ducart</u>, 2:17-cv-1402 KJM DB P (ECF No. 1 at 18).  It shows that eight inmates participated in it.

28

Gutierrez states that he observed officers conducting the Guard One checks both before and after their implementation and he opines that the noise created by other activities in the SHU was greater than the noise created by using Guard One.  (ECF No. 97-6 at 5.)

Gutierrez states that he understood that an officer who "slammed" a rod against the disk would not register a contact, which would result in supervisory intervention.  He was informed of no such incidents.  (ECF No. 97-6 at 5.)

### ii.   Defendant Holland

Defendant Holland was the CCI warden during the relevant time period.  Like Gutierrez, Holland states that she understood CCI's implementation of the Guard One checks was required by the court in <u>Coleman</u>.  Holland also believed she did not have authority to alter the Guard One procedures.

Holland was copied on each of the 18 appeals considered at the third level of review. (Exs. A to R to Voong Decl. (ECF No. 97-4 at 4-198).)  She states that, as warden, she received copies of many inmate appeals.  In her 2018 declaration, Holland states that she does not "recall an issue with appeals alleging harm to inmates related to the continued use of Guard One or security checks that were granted after review and investigation."   (ECF No. 97-7 at 5-6.)

Holland states that she observed officers conducting Guard One checks prior to full implementation, after the system was implemented, and on "random tours of the SHU and ASU." (ECF No. 97-7 at 4.)  She also states, "[b]ased on my personal observations, staff followed the security and welfare check policies."  (<u>Id.</u> at 5.)

Like Gutierrez, Holland says she would have known if officers' were using Guard One in a way that caused a problem with the counts of pipe to disk contacts.  (ECF No. 97-7 at 5.)

### b.   What Defendants Did

The inmate complaints provided to the court show the first complaint submitted on May 30, 2014 and the last submitted on September 22, 2014.  (ECF No. 104 at 126, 239.)  There is little indication in the appeal responses about what was done in response to the complaints.  The first mention that an inquiry was conducted shows up in the August 6, 2014 response to grievance no. CCI 14-1391.  (<u>See</u> ECF No. 104 at 112.)  The response, signed by defendant Gutierrez, states

"An inquiry into the utilization of the Guard One safety/security checks was conducted and disclosed that the Correctional Officers conducting the safety/security checks are conducting the safety/security checks appropriately." (Id.)  The response does not explain how or when the inquiry was conducted.  After that date, second and third level responses used essentially identical language that an unidentified "inquiry" had been conducted,[13] stated that first watch officers were "making every attempt to reduce the noise that may be caused during Guard One safety/security checks,"[14] or made no statements indicating an effort had been made to investigate the use of Guard One.[15]  In response to at least one appeal, the inmates' request for ear plugs was denied based on prison policy.  (ECF No. 104 at 284 (group appeal).)

In his declaration, defendant Gutierrez states, "[i]n response to the inmate appeals, inquiries were made to the supervisors for Facilities A and B, who confirmed that the correctional officers were conducting the checks according to policy."  (ECF No. 97-6 at 5.)  Gutierrez does not provide any further information about the inquiries.  He does not explain how many inquiries were made, what the supervisors were asked and what, if anything, they did in response.  Gutierrez's declaration shows only that someone asked the supervisors about the Guard One checks and that person was told the checks were being conducted according to policy.

It is also worth noting that there is only one indication that any other inquiries about use of the Guard One were made after the inquiry mentioned in the August 6, 2014 Second Level Response authored by Gutierrez.  Defendants state that "inquiries were made to supervisors" in response to plaintiff's grievance.  (DSUF #57.)  Plaintiff does not dispute that statement.  (ECF

---

[13] See ECF No. 104 at 68, 99, 122, 140-41, 174, 182 (plaintiff's grievance), 199, 244, 247 (inquiry language in Third Level Response only), 260 (Third Level Response states "reviewer" found CCI "staff are following policy and procedure"); 277, 305, 317.  In one grievance, the inmate complained about the use of Guard One by a specific correctional officer.  ECF No. 104 at 146.  The response indicated that an investigation was conducted.  It stated that a correctional sergeant observed that officer's use of Guard One.  Id. at 146-47.

[14] See ECF No. 104 at 91-92, 132, 164, 195, 209.

[15] It does not appear that either party provided a copy of the complete Second Level Response to CCI no. 14-2137, the grievance signed by over 50 inmates.  See ECF No. 104 at 220 (first page of Second Level Response).  However, the Third Level Response does not mention any sort of inquiry.  See ECF No. 97-4 at 126-27; ECF No. 104 at 206-07.

1    No. 149 at 38.)  However, the second level response to his grievance contains the same

2    boilerplate language about an inquiry used in many other second level responses.  (See fn. 13,

3    supra.)  The boilerplate language about an inquiry could reflect that prison staff reviewing the

4    inmate grievances inquired about the use of Guard One just once.  There is no indication that

5    inquiries or investigations into the noise created by Guard One were conducted any time after

6    August 6.  Yet, Gutierrez would have been aware that many inmates submitted grievances after

7    that time.  In addition to some individual grievances, the evidence presented shows that four

8    group appeals, including the appeal signed by over 50 inmates, were submitted after August 6.

9    (See ECF No. 104 at 139 (13 inmates), 161-62 (24 inmates), 204 (13 inmates), 221-25 (over 50

10   inmates).)

11         With respect to defendant Holland, there is no indication she took any action with respect

12   to inmate complaints regarding the use of Guard One.

13              **c.   Are Defendants Entitled to Qualified Immunity on Summary Judgment?**

14         This case differs in significant respects from the facts presented in Rico I.  Defendant

15   Gutierrez knew that at least 100 inmates complained about the use of Guard One, particularly

16   during first watch.  Gutierrez also knew or should have known that a number of inmate

17   complaints indicated that officers were intentionally hitting the metal disks with more force than

18   necessary.  (E.g., ECF No. 104 at 32-34 (July 2014 grievance by plaintiff Murillo); at 67-68 (July

19   2014 grievance that officers striking cell doors with too much force); at 77 (Sept. 2014 grievance

20   including allegation that officers were banging, not touching, the baton to the metal plate on the

21   cell door); at 86 (Sept. 2014 grievance including allegation that officers were "hitting the cell

22   doors with enough force to rattle us awake"); at 104 (July 2014 grievance including allegation

23   that officers were "constantly banging" the cell doors).)

24         With respect to defendant Holland, she states that she does not recall an issue regarding

25   Guard One use.  However, she limits that statement to appeals that were granted after review and

26   investigation.  (ECF No. 97-7 at 6.)  She states that she was typically only notified about appeals

27   that were granted.  (Id. at 5.)  However, the evidence shows that she was copied on all third level

28   ////

1   decisions.  There is an issue of fact about whether Holland was aware of the many appeals denied

2   at the third level of review regarding inmates' complaints about Guard One.

3        There are also material issues of fact about the amount of noise caused by use of Guard

4   One, particularly during first watch.  Gutierrez's statements that he observed use of Guard One

5   and felt it did not create much noise lead to more questions than they answer.  Gutierrez provides

6   no detail about his observations.  He does not provide the dates or times of those observations.  If

7   Gutierrez simply observed officers conducting the checks during the day, when other noise-

8   producing activity was going on, he could not know what noise the Guard One checks generated

9   at night.  See Gardner v. Andrews, No. 5:15-cv-00231 JM-PSH, 2018 WL 2307011, at *4 (E.D.

10  Ark. Apr. 26, 2018) (Because the noise levels were taken during the day and not at night and

11  represented the noise level at just one time on one date, the test results did not establish that the

12  noise levels were always within standards while the inmate was in isolation.), rep. and reco.

13  adopted, 2018 WL 2305695 (E.D. Ark. May 21, 2018).  Further, there is no indication where in

14  the SHU Gutierrez was when he observed officers conducting the checks.  If he was not standing

15  near an inmate's door, he could not know the extent of the noise generated by the contact between

16  the pipe and disk.

17       The same is true for Holland's statement about her observations.  While Holland's

18  statement indicates she had more frequent observations of the use of Guard One than Gutierrez

19  did, she does not state when or at what times those observations occurred.  There is no indication

20  Holland was present during first watch or was close enough to a cell door to have any sense of the

21  noise an inmate may have experienced.  Further, while her tours may have been "random," that

22  does not mean officers were not aware of her presence and may have been unusually careful

23  when conducting the Guard One checks.

24       While defendants did not have authority to change the basic procedures for conducting the

25  Guard One checks, there is no indication that they took any action on the inmate complaints

26  except for one or more unexplained inquiries to supervisors about whether the officers were

27  conducting the checks appropriately.  There are questions of material fact about the noise created

28  ////

27

1   by use of Guard One, what defendants could have done to reduce that noise, and what defendants

2   did, among others.

3        Defendants raise a point with respect to defendant Holland that requires consideration.

4   Defendants note that another inmate filed a suit alleging defendant Holland violated his civil

5   rights by implementing Guard One in 2014 and 2015 at CCI.  In that case, <u>Matthews v. Holland</u>,

6   1:14-cv-1959 (E.D. Cal.), the inmate made the same essential claim made here – that Holland

7   failed to take action in response to his complaint that Guard One caused excessive noise,

8   disrupting his sleep.  As part of an order addressing the effect of <u>Rico I</u> on many of the related

9   Guard One cases, though not addressing the present case, Chief Judge Mueller summarily

10  dismissed inmate Matthews' case against Holland on the grounds of qualified immunity.  <u>Id.</u>

11  (ECF No. 89 at 6, as amended by ECF No. 93.)  This court does not find the qualified immunity

12  decision in <u>Matthews</u> necessarily controls the decision of Holland's entitlement to qualified

13  immunity in the present case.  Defendants fail to show that the relevant evidence before the court

14  in <u>Matthews</u> is similar to the evidence before the court in the present case.  The Ninth Circuit

15  made clear that the specific facts of <u>Rico I</u> lead to its decision.  This court finds that <u>Matthews</u>

16  does not control the qualified immunity determination in this case.

17       The law was clearly established in 2014 and 2015 that causing excessive noise and

18  causing excessive sleep deprivation violated an inmate's Eighth Amendment rights.  In the

19  present case, the evidence shows that defendants knew many inmates complained that the

20  frequent, loud sounds made by the use of Guard One, particularly during first watch, were

21  causing sleep deprivation.  There are issues of material fact about defendants' first-hand

22  knowledge of the use of Guard One, what sort of inquiry or inquiries were made to floor officers'

23  supervisors, how many of those inquiries were made, and whether the CCI SHU's structure

24  amplified the Guard One noise or otherwise contributed to inmates' sleep deprivation.  This court

25  finds material issues of  fact about what defendants knew and what they did.  A factfinder should

26  determine whether reasonable officials in defendants' positions would have been on notice that

27  their conduct was illegal.

28  ////

1

## B.  Merits of Eighth Amendment Claim

2     Defendants also argue that plaintiff cannot succeed on the merits of his Eighth

3 Amendment claim.  As set out above, to succeed on his claim, plaintiff must show that defendants

4 were deliberately indifferent to a serious risk of harm.  A prison official violates the Eighth

5 Amendment "only if he knows that inmates face a substantial risk of serious harm and disregards

6 that risk by failing to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825,

7 847 (1994).

8     The discussion in the prior section shows that there are issues of material fact on these

9 questions.  Defendants knew that many inmates were complaining about sleep deprivation due to

10 the use of Guard One.  Because excessive sleep deprivation and excessive noise can amount to an

11 Eighth Amendment violation, it follows that inmates experiencing those problems may face a

12 serious risk of harm.  Rico I, 980 F.3d at 1298.  Defendants argue that the sounds generated by

13 use of Guard One are not so extreme as to constitute an excessive risk of harm to inmate safety.

14 However, the severity of the sounds generated by use of Guard One, particularly during first

15 watch, is an unresolved issue of fact.

16     The undisputed facts show that inmates were complaining of sleep deprivation, that

17 defendants had visited the SHU on some occasions when Guard One was being used, and that

18 defendants were told, possibly only once, by a supervisor that floor officers were using Guard

19 One appropriately.  Defendants point out that the Coleman special master was monitoring the use

20 of Guard One.  (DSUF #18.)  However, defendants provide no evidence that the special master

21 investigated the use of Guard One at CCI or was made aware of inmate complaints there.  The

22 fact that the special master investigated inmate complaints at Pelican Bay (see DSUF #17) does

23 not establish any investigation into inmate complaints at CCI.  This court cannot resolve the

24 question of the seriousness of the risk of harm on the facts provided.

25     With respect to whether defendants acted with deliberate indifference, the undisputed

26 facts provide little information about what defendants did in response to the grievances.  There is

27 no showing that they seriously investigated officers' use of Guard One.  Nor is there any showing

28 ////

1    that they made any attempt to mitigate the effects of its use such as by providing ear plugs.

2    Defendants should not succeed on the merits of plaintiff's Eighth Amendment claim at this stage.

3                                    **CONCLUSION**

4          Above, this court finds material issues of fact about defendants' entitlement to qualified

5    immunity.  This court further finds material issues of fact on the merits of plaintiff's Eighth

6    Amendment claim.  These questions cannot be resolved on summary judgment.

7          For the foregoing reasons, IT IS RECOMMENDED that defendant's motion for summary

8    judgment (ECF No. 147) be denied.

9          These findings and recommendations will be submitted to the United States District Judge

10   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

11   after being served with these findings and recommendations, either party may file written

12   objections with the court.  The document should be captioned "Objections to Magistrate Judge's

13   Findings and Recommendations."  The parties are advised that failure to file objections within the

14   specified time may result in waiver of the right to appeal the district court's order.  Martinez v.

15   Ylst, 951 F.2d 1153 (9th Cir. 1991).

16   Dated:  July 29, 2024

17

18                                                       _____

19                                                       DEBORAH BARNES
                                                          UNITED STATES MAGISTRATE JUDGE
20

21

22

23

24

25   DLB:9
     DB prisoner inbox/civil rights/S/murr0266.msj(2) fr
26

27

28
                                            30